# BOARD OF MAYOR AND ALDERMEN, TOWN OF MILAN v. THOMAS et al.—178 S. W. (2d) 772.

Western Section.   November 1, 1943.

Petition for Certiorari denied by Supreme Court, February 1, 1944.

Holmes & Holmes, of Trenton, and Arthur C. Rogers, of Milan, for plaintiff in error.

Harry H. Elder, of Trenton, for defendant in error.

BAPTIST, J. The parties will be called plaintiff and defendant as in the Circuit Court.

The plaintiff, Board of Mayor and Aldermen, Town of Milan, filed a petition in the Circuit Court of Gibson County seeking to condemn certain parts of a tract of land owned by the defendant, James Thomas and his wife, Mrs. Frankie Thomas, for the erection of a sewerage disposal plant, the construction of two sewer lines and a roadway across the tract of land to said plant.

On application of the plaintiff a jury of view was summoned and which after viewing the land and taking testi-

mony returned a verdict for the defendants and fixed the amount of damages at a total of $4350.

The plaintiff excepted to this verdict and the case was tried by a jury in the Circuit Court. This jury returned a verdict fixing the value of the land taken at $720 and the incidental damages to that part of the tract of land not taken at $4300. This latter amount included $300 as damages to the crops growing on the land.

The plaintiff's motion for a new trial having been overruled, the plaintiff has appealed to this court and assigned errors.

The tract of land in question consists of about 114 acres and formerly belonged to Mrs. J. A. McAllister. About the year 1924 the Town of Milan purchased from Mrs. McAllister for a consideration of $500, fifty-seven one-hundredths (.57) of an acre out of the north east corner of the 114 acre tract, for the purpose of establishing a sewerage disposal plant. This plant consisted of a septic tank 40x20 feet, the sewage going into one end and out of the other. There was what is designated as an outfall line across the north portion of the McAllister farm 1500 feet in length. At this time the population of Milan was less than 2000.

Because of the establishment by the Federal Government of what is known as the Wolf Creek Ordnance Plant at or near Milan the population has greatly increased and according to a recent unofficial census is now about 7000 or 8000. For this reason the original sewerage disposal plant became inadequate and the petition in this case was filed for the purpose of constructing a sewerage disposal plant adequate to meet the needs of this increased population.

The petition sought to condemn for this purpose the following:

3.87 acres in fee for the disposal plant.

2.40 acres in fee for the roadway to the plant.

1.3 acres easement during construction of Wolf Creek sewer.

1 acre easement during construction of Wahl St. sewer.

⅝ of an acre permanent easement for Wolf Creek sewer.

⅓ of an acre permanent easement for Wahl St. sewer.

This sewerage disposal plant consists of a pump house 12x12 feet and about 12 feet high; the lower part made of concrete and the upper part of concrete rock; two settling tanks which let out a large part of the sewerage and each of which are 25x25 feet and rise 4 feet above the surface of the ground; a digester built of concrete 18 feet high, to be covered with earth and later with grass; a sludge pit about 100x60 feet with a concrete wall rising 4 feet above the surface of the ground; two outfall lines, one of which parallels the original outfall, known as the Wahl Street outfall, the other known as the Wolf Creek outfall. The Wahl Street outfall is about 1500 feet in length across the north portion of the 114 acre tract, and the Wolf Creek outfall line is about 2100 feet across the east part of the tract. For construction purposes the easement was 20 feet in width, the permanent easement being 5 feet.

The sewer pipes are from 6 to 12 feet under ground, and there are man holes at intervals of 500 feet which project above the ground 3 or 4 feet. In addition the plaintiff has constructed a line of water pipes parallel with the sewer lines to furnish water to the sewerage plant.

The roadway which was taken under these proceedings is 30 feet in width. It runs from the southwest corner of the tract east with defendant's south boundary line 1278 feet and then runs northeast across the tract to the northeast corner where the sewerage plant is located and comprises 2.40 acres. The southwest corner of the tract is the east end of Factory Street and also the east corporation line of Milan. The residence of the defendants is in the southwest corner of the tract. The 114 acres is almost in the shape of a square, being a little longer north and south than east and west.

No question is made by the plaintiff in error on the award of $720 as the value of the land taken.

It is apparent that the jury in fixing the amount of incidental damages at $4300 included in that amount $300 as damages to the crops then growing upon the land, so the question is as to the correctness of the award of $4000 as incidental damages to that part of the land not taken.

The first assignment of error contends that the Trial Court was in error in overruling the plaintiff's first four grounds of its motion for a new trial.

These grounds complain of that part of the verdict of the jury which awards to the defendants $4000 as incidental or consequential damages to that part of the tract of land not taken by petitioner, as being so excessive as to evince passion or prejudice on the part of the jury; as being against the preponderance of the evidence and as being contrary to the law and the evidence.

The defendant, James Thomas, testified that the tract of land in question was east of the Town of Milan, being near the northeast corner of the town and bounded by the corporation line, his residence being the southwest corner

of the tract; that there was 35 or 40 acres of the tract facing the highway on one side and the town on the other, and that this part of the tract was suitable for building lots and could be used as a subdivision; that since the location of the shell loading plant there had been much building in Milan and in his neighborhood; that the sewerage disposal plant as located and erected would be in plain view of any lots in such subdivision; that this sewerage disposal plant, the construction of the two sewer lines across the land and the roadway across the land from the southwest corner to the disposal plant affected the value of the remainder of the land. His opinion was that it damaged the value of that part of the tract suitable for building lots; that the sewerage lines had eight manholes on the cultivated land in the bottom, these manholes being three to five feet high and six feet in diameter; that the disposal plant, the sewer lines and the roadway divided the farm into five tracts, and that by reason of these facts the value of the land was damaged two-thirds; his opinion was that before the condemnation proceedings the tract was worth $150 per acre or about $17,000, and that subsequent to the condemnation proceedings the market value was not more than $5000.

The defendant introduced six witnesses other than James Thomas on the question of incidental damages.

John Caldwell testified that he lived in Milan and is a landowner; that the cash market value of the land before the condemnation was $14,000, and that on account of the construction its value was $7000.

Marvin Jones testified that he lives near Milan and is a landowner; that before the condemnation the cash

market value of the tract was $15,000 to $16,000, and that on account of the construction its value was $8000.

John Hassell testified that he was a landowner and member of the jury of view; that before the condemnation proceedings the market value of the tract was $17,000 or $150 per acre, and that after the construction its value was 50 per cent or $8000.

John Wade testified that he was a landowner and a member of the jury of view; that before the construction the cash market value of the tract was $12,000, and after the construction its value was $6000.

Will McCauley testified that he lives near Milan and owns land adjoining the land in question; that before the condemnation proceedings the market value of the tract was $13,000 to $14,000, and after the construction its value was $9000.

John Jetton testified that he was a landowner and member of the jury of view; that before the condemnation proceedings the market value of the land was $15,000 and after the construction its value was $8500.

The plaintiff introduced 3 witnesses in rebuttal.

G. H. Sims testified that he was a property owner in and around Milan; that in his opinion the construction of the sewerage disposal plant and the road taken did not damage the tract any, but that the construction of the sewer line and man holes damaged it some but would not undertake to say how much.

R. B. Veasy testified that in his opinion the construction had depreciated the value of the farm, but he did not know how much.

W. S. Taylor testified that the construction did not damage the value of the land.

■ Under this evidence we are of the opinion that the verdict of the jury awarding $4000 as incidental damages is sustained by a preponderance of the evidence and is not excessive. Accordingly, the first assignment of error is overruled.

The second assignment of error is to the action of the court in permitting the witness, John Caldwell, to testify, over the objection of the plaintiff, that in the year 1941 he had offered to buy the defendants' tract of 114 acres at the price of $14,000, and relies upon Vaulx v. Tennessee Central Railroad Co., 120 Tenn. 316, 336, 108 S. W. 1142, 1148, to sustain his contention.

In the above cited case, the witness was asked to state the best offer, if any offer was made to the owner of the property prior to the taking of it by the railroad. This was objected to by the plaintiff and the objection sustained by the Trial Court. The witness, if permitted, would have answered that an offer was made some time before of $600 an acre for one-half of the place. Nothing further appeared in the record on the subject except a similar question and to which the Trial Court sustained an objection. The Supreme Court held that the action of the Trial Court in excluding this evidence was correct and said:

"If persons could prove the value of their lands in this manner, nothing would be easier than to prepare for the controversy by having offers made through friendly parties having no real purpose to buy."

■ We are of the opinion that the admission of the evidence was error but that such error was harmless and did not affect the result of the trial, nor can we conceive that the jury was in any way misled by it. The evidence which we have set out shows that all of the witnesses

testified the tract of land was worth as much or more than the amount of the offer which was permitted to be proven, including the witness by whom the offer was proven.

Code, Section 10654, provides that no verdict or judgment shall be set aside or new trial granted by any Appellate Court in any cause on account of the improper admission or rejection of evidence unless, in the opinion of the Appellate Court, after an examination of the entire record in the cause, it shall affirmatively appear that the error complained of has affected the results of the trial.

In Lovier v. Nashville, 1 Tenn. App. 401, it is held that there will be no reversal for erroneously admitted evidence where there is sufficient competent evidence to establish point of fact in question.

We are of the opinion that the section of the Code and the case cited apply to the facts of this case and the second assignment of error is overruled.

The third assignment of error is to the action of the Trial Court in refusing to give in charge the special request tendered by the plaintiff as follows:

"I further instruct you that the defendants are not entitled to recover for incidental damages to defendants' tract of land, solely because of the use to which petitioner intends the 3.87 acre tract, if you find that the 3.87 acre tract immediately adjoins and is contiguous to a tract of .57 acres conveyed by defendants' predecessor in title to the Town of Milan to be used for septic tank, or tanks, or treating plant or plants."

The fourth assignment of error is to the action of the Trial Court in charging the jury as follows:

"Incidental damages is that impairment, loss or reduction to its just, fair value of the property not taken suffers, that directly and proximately results from the

taking of the part used in its manner, form and place and by the construction, maintenance and operation of a sewage plant, sewage disposal lines and roadway, upon the land taken by the plaintiff, assuming at all times that the construction, maintenance and operation will be done with reasonable care, caution, skill and prudence. In estimating the incidental damage to the remainder of the land, everything necessarily connected with and directly and proximately resulting from the taking of the part of the tract and from the assumed careful construction, maintenance and operation thereon of the sewage plant, disposal lines and roadway, which is shown by a preponderance of the evidence has the effect of directly and proximately reducing or impairing the value of the land can be considered by you. You may take into consideration the shape of the tract after the taking, the parts into which the remainder is divided, the inconvenience, if any, in the cultivation of the remainder, occasioned by the construction, operation, maintenance and existence of the sewage plant, lines and roadway, the invasion of privacy, if any, if the greater weight of the evidence shows you these things impair the adaptability for the things or the purposes for which the land not taken may be legitimately used. The jury may also take into consideration, if authorized by the greater weight of the evidence, the injury to the balance of the land either for agriculture or for sale, the decrease in price, if any, for the remainder of the tract, the expense of fencing, if any, destruction or injury to the growing crops.''

The contention is that the jury should have been instructed that they could or should take into consideration the fact that the defendants' predecessor in title had

conveyed to the plaintiff a portion of the original tract to be used as a disposal plant.

The deed from Mrs. McAllister of date January 23, 1924, was introduced as evidence.

It conveyed to the town fifty seven one-hundredths (.57) of an acre "for the purpose of erecting sewerage tank or tanks, and treating plant or plants." It also conveyed "an easement of way of egress and ingress in and to and from said sewerage tank or tanks, and treating plant or plants."

The evidence is that the sewerage tank erected under this deed was a vat of cesspool 20x40 feet, the top being open and practically level with the surface of the ground and is now in a thicket.

It further appears in evidence that under the plan devised by the welfare and sanitary engineer the town would abandon the old sewer line and cesspool, and upon another part of the tract is building a new disposal plant, new sewer lines and water lines, a gravel road, all on other parts of the tract which is now owned by the defendants and sought to be condemned in this proceedings.

In the brief of the plaintiff it is stated:

"Of course, we are not contending that the conveyance from Mrs. McAllister would relieve the City from having to pay for any additional land, nor from liability to pay for any incidental damages to the remainder of the tract, because of the appropriation.

"But we do insist that the conveyance to the City was a complete settlement and release of incidental damages to the remainder of the tract *arising solely out of the particular use for a disposal plant.*"

The plaintiff, in support of this insistence, relies upon the rule as stated in Lewis on Eminent Domain, Section 447, page 843, as follows:

"The conveyance of land for a public purpose will ordinarily vest in the grantee the same rights as though the land had been acquired by condemnation. The conveyance will be held to be a release of all damage which would be presumed to be included in the award of damages if the property had been condemned. The grantor therefore cannot recover for any damages to the remainder of his land which result from a proper construction, use and operation of works upon the property conveyed. Damages which result from improper construction, such as lack of necessary culverts, or diverting a stream of water, or negligence of any kind, may, of course, be recovered."

We do not think the rule as stated in the above authority is in point. In the instant case the defendants are not claiming any damages arising from the use of the .57 of an acre conveyed by Mrs. McAllister, but the claim is based upon the use of that part of the tract condemned by the plaintiff. These portions of the land are separate and distinct and the fact that they are contiguous does not alter the rule that the defendants are entitled to the damages caused by the taking of the last portion of the land.

For the same reason the cases of Hord v. Holston River Railroad Co., 122 Tenn. 399, 123 S. W. 637, 135 Am. St. Rep. 887, 19 Ann. Cas. 331, and Knott v. Louisville & N. Railroad Co., 144 Tenn. 676, 234 S. W. 1003, 19 A. L. R. 482, cited by the plaintiff, have no application.

In each of these cases the plaintiff had conveyed to the railroad company a right of way to his property, and

each claimed damages caused by the company's manner of constructing the right of way. In each case the court held that such damages were embraced in the consideration received for the land.

■■ We are of the opinion that the Trial Court was correct in refusing the special request on which the third assignment of error is made. We are also of the opinion that the portion of the court's charge on which the fourth assignment of error is made contains a correct statement of the law is applied to the facts of this case.

The third and fourth assignments of error are overruled.

The fifth assignment of error is based upon the action of the Trial Judge in permitting, over the objection of the plaintiff, Marvin Jones and Will McCauley to testify as witnesses for the defendant.

At the close of the plaintiff's testimony a short recess was taken by the court, and during this recess the attorneys for the defendant had a conference with the witnesses. This conference occurred in the court room and was evidently of short duration. The rule having been called for and the two named witnesses being present at the conference, it is insisted that the court violated its discretion in admitting their testimony.

When the witness, Marvin Jones, was offered, the following occurred:

"Q. Marvin, during the recess of the Court that we had this afternoon, you were right over here at the window in the company of Will McCauley, John Caldwell, James Thomas, Charlie Burrow, Jess Bell, and a man by the name of McCollum, whose first name I can't recall, and the defendant's attorneys in this case, isn't that true? A. Yes, sir.

"Q. While you were there, did you discuss the testimony in this case? A. Well, we just talked about the case.

"Q. Talked about the values of the land? A. To some extent, yes, sir.

"Q. Talked about damages? A. Well, not damages, we talked about the value of the land.

"Q. Talked about what your testimony would be? A. You mean my testimony?

"Q. Yes. A. Well not mine separate, we didn't specify any separate one.

"Q. Marvin, don't you know that all of you over there were discussing the question of the value of this tract of land before and after the City took possession of this part of it and about the location of this road through there, and the location of the outfall lines, and whether you could see the buildings of the plant or not? A. Yes, we talked about that."

Thereupon, Mr. J. D. Senter, of counsel for defendants made the statement:

"Mr. Senter: The rule Judge Holmes has in mind has no application here. The convervation was restricted to that. I am sure that Judge Holmes did not intend to submit that we would go over with these witnesses anything said by one witness when they were under the rule. The only purpose for not consulting with witnesses on that question as to any testimony that had taken place in the trial of the case; nothing of that kind happened. I doubt if Mr. Jones or anybody else knows what did happen. It was just a short review principally of the order in which these witnesses might be introduced. Certain of the witnesses were going to have to leave this afternoon and we wanted to go over that and when they

had to leave, was the purpose of the recess. Nothing was mentioned to any of them about the testimony in this lawsuit and that is sufficient to answer any objection to the testimony of the witness. The Court: Strictly speaking, none of them can be approached except by attorneys in the case and individually, but if no harm was done and neither side prejudiced by it, I will overrule the objection. Mr. Senter: We were right here in plain view of the Court.''

In Nelson v. State, 32 Tenn. 237, it was held:

''The practice of examining witnesses upon the trial, separate and apart from each other, is one which is to be controlled in a very great degree, by the presiding judge, and the supreme court will not undertake to revise his practice in this respect, unless there be such a manifest departure from a proper exercise of this discretion as might result in defeating the great object of the rule.''

In Smith v. State, 72 Tenn. 428, 430, it is said:

''But all the authorities agree that the right of excluding the witness for disobedience to the order is in the discretion of the Court, a discretion rarely exercised: 1 Greenl. Ev., Sec. 432 and cases cited.''

■ The matter of admitting the testimony complained of was in the discretion of the court and its discretion was not abused.

The fifth assignment of error is overruled.

In the days of the youth of the writer of this opinion, a family disposal plant was a necessary appurtenance to human habitation. It was a structure not to be proud of, being removed from human gaze as well as ingenuity could devise. It was in the nature of a cloistered retreat, artfully concealed with morning glories, blackberry bushes, trailing vines and other growth. To have placed

it where it could not be concealed would have lessened the desirability of the home as a place of residence.

In the instant case the plaintiff has erected a magnified ''Chic Sale'' in the constant view of the defendants. In the brief of the defendants our attention is called to the rule as stated in Lebanon & N. Turnpike Co. v. Creveling, 159 Tenn. 147, 17 S. W. (2d) 22, 65 A. L. R. 440, that under our statutes and system the proceedings in condemnation contemplating a wide scope of inquiry, with flexible limitations in the fixing of a fair and reasonable value, and that the door is open wide to both parties to the controversy to submit all facts deemed by either pertinent to the issue.

We will assume in this inquiry the jury took into consideration the offense to the sensibilities of the defendants as well as the disinclination of a prospective purchaser to buy a building lot when he looked upon this improvement erected by the Town of Milan and realized the purpose to which it was devoted.

The judgment of the Circuit Court is affirmed and the plaintiff will pay the costs.

Anderson, P. J., and Ketchum, J., concur.